[No. 31263-8-II.    Division Two.    March 22, 2005.]

*In the Matter of the Marriage of* KENNETH R. KASEBURG,
*Appellant*, and ROCHELLE D. KASEBURG, *Respondent.*

548

*Brendan F. Patrick*, for appellant.

*Thomas T. Osinski, Jr.*, and *Stephan D. Downing*, for respondent.

¶1 VAN DEREN, J. — Kenneth R. Kaseburg challenges the trial court's $150,000 award to Rochelle Kaseburg for her community interest in the former family home and its findings that he committed fraud, waste, and other financial misconduct. He asserts that (1) the trial court did not have authority to award the judgment because it was based solely on a fraud claim that was not pleaded, (2) Rochelle[1] waived her claims because she did not challenge the foreclosure proceedings that extinguished the debt and the parties' interest in the family home, and (3) sufficient evidence does not support the court's findings of fraud and financial misconduct. We reverse the award and vacate the trial court's findings of fraud, waste, and financial miscon-

---

[1] We use the parties' first names for clarity.

duct concerning the debt owed to Ken's parents for extensive financial assistance to the community for the former family home. We also deny the wife's request for attorney fees.

## FACTS

A. Background

¶2 Ken and Rochelle were married in 1989 when Ken was working as a pilot and Rochelle was a flight attendant. With the financial help of Ken's parents, the couple purchased two homes: one in Seattle's Normandy Park neighborhood and a "fixer-upper" in Seahurst. They were eventually sold, both at a loss.

¶3 Ken and Rochelle consistently borrowed money from Ken's parents for both living expenses and remodeling their Normandy Park home. Then in 1994, Ken was severely injured on the jet way. He was out of work for two years and received disability compensation for most of this time.

¶4 In 1994, Ken purchased a vacant lot on Snag Island to build a dream home. Between 1995 to 1997, the couple developed the lot. Ken supervised the construction, which was financed almost entirely by loans from Ken's parents, although the Normandy Park property was also sold at a loss to help pay for some construction costs. Upon its completion the home had 4,000 square feet of living space, two separate garages, and expensive details, including unique kitchen cabinetry and stonework.

¶5 Ken, Rochelle, and their two children moved into the Snag Island home in October 1996. In October 1997, the couple executed an $850,000 promissory note and a deed of trust on the Snag Island home in favor of Ken's parents in recognition of the loans the couple had received from 1989 to 1997. A central purpose of the note was to protect Ken's parents' investment in the home and to limit recovery against Rochelle and Ken from any potential lawsuit arising from an accident on Lake Tapps, which fronted their

property. Ken's parents did not record the note or deed of trust when they were executed.

¶6 Ken returned to work as a commercial pilot in 1997; however, his health problems caused him to work less than anticipated. Consequently, Ken and Rochelle continued to borrow from Ken's parents for living expenses. In 1998 and 1999, Ken and Rochelle took out additional commercial loans for their living expenses.

¶7 In the fall of 2000, Ken and Rochelle briefly separated. Ken's father threatened to call the October 1997 promissory note but changed his mind when the couple reconciled. Rochelle later testified that this was the first time that she learned the promissory note was for $850,000. Ken and Rochelle separated for the final time in May 2002.

## B. Dissolution Trial

### 1. Pretrial events

¶8 Ken petitioned to dissolve the marriage and Rochelle signed a joinder on May 22, 2002. The joint petition requested that the court award any interest in the Snag Island home to Ken and that he be required to pay a variety of debts and liabilities, including the $850,000 debt owed to his parents. In January 2003, Rochelle questioned the October 1997 promissory note's accuracy through discovery on the $850,000 debt.

¶9 Ken's parents initiated a foreclosure action under chapter 61.24 RCW on the note and deed of trust in early 2003. In April 2003, Rochelle was served a notice of default of the foreclosure proceedings on the Snag Island home. The last paragraph of the foreclosure default notice stated, "RECOURSE TO COURTS: You or your successor(s) in interest have recourse to the courts to contest the alleged default *on any proper ground*." Ex. 62 (emphasis added). In June 2003, Rochelle also received notice of trustee's sale of the Snag Island home. Rochelle did not contest the foreclosure proceedings.

¶10 The dissolution trial was expected to occur in June or July 2003; however, it was continued to September 2003.[2] On June 3, 2003, Ken filed pretrial ER 904 exhibits that included Ken's parents' check registers showing the many checks they wrote to Ken and Rochelle from 1989 to 1997.[3]

¶11 On September 12, 2003, 10 days before the dissolution trial started on September 22, 2003, the Snag Island home was foreclosed. The nonjudicial foreclosure sale was held according to the deeds of trust statute, chapter 61.24 RCW. Ken's parents were the successful bidders and they took title of the property.

## 2. Trial Proceedings

¶12 By the time of trial in September 2003, the couple had no real property and few other assets to divide. They prepared elaborate and detailed lists dividing the personal property, which the court adopted. The net value of the marital estate was approximately $95,000. The Snag Island home belonged to Ken's parents because the foreclosure action was final more than a week before the dissolution trial. Ken's pretrial information form stated that there was, "[n]o real property [to distribute] due to foreclosure." 1 Clerk's Papers (CP) at 18.

¶13 At trial, Ken intended to focus on his proposed parenting plan and Rochelle's allegations of domestic violence. Although Rochelle's opening statement addressed the same issues, she also asserted that Ken had exerted oppressive control of the couple's finances and that the October 1997 promissory note was fraudulent and inflated, entitling

---

[2] The record is unclear whether the original trial date was in June or July 2003. Ken's trial counsel stated June 2003 and Rochelle testified it was July 8, 2003.

[3] At the time Ken filed his ER 904 exhibits, the Snag Island home and Ken and Rochelle's obligation on the debt was before the court because the unchallenged foreclosure proceedings were incomplete. Ken proffered his parent's check registers as evidence of the debt of the $850,000 promissory note because many of the checks themselves were too old to be retrieved from banks when Rochelle raised the issue for the first time in 2003.

her to a $500,000 judgment against Ken for concealment of the value of the Snag Island home.

¶14 Rochelle's counsel stated,

[Rochelle] was originally led to believe [the October 1997 promissory note] was for $350,000, and it turned out to be $850,000, on a piece of property that cost $146,000 when it was purchased. I do not believe that you will see any evidence presented to this Court by Mr. Kaseburg or others that will demonstrate how or why that figure was arrived at, other than their belief that that's what its value was. The truth of the matter is that there was never an attempt to refinance, to secure financing [for the Snag Island home].

My client had been warned "If you leave this marriage, you will be financially ruined["], and that's what the attempt is being made here today.

My client through her testimony and the testimony of others will attempt to show this Court that fraud took place with regard to this property on Snag Island, and I fully well understand the elements of fraud, but I believe they can be shown.

1 Report of Proceedings (RP) at 15-16.

¶15 Ken moved to strike Rochelle's fraud allegation regarding the note. He argued that the court could not consider any net value of the Snag Island home because it was no longer an asset before the court due to the uncontested and complete foreclosure proceedings. He also asserted that Rochelle had not brought a motion to amend the joint dissolution petition to assert a common law fraud claim.[4]

¶16 The court denied Ken's motion to strike and made the following oral ruling:

*I don't have all the evidence yet,* but I'm not satisfied that I shouldn't hear all the evidence and then make a ruling on the issue. I understand the Deed of Trust foreclosure laws. I understand this property is no longer in this marital dissolu-

---

[4] The record before us does not include any of Rochelle's trial memoranda, including her briefs discussing fraud.

tion action. *But what is in front of the Court is the issue of potential waste, mishandling of community assets, etc[.]; and I have an obligation to look at those issues, and so I'm going to do so.* So I'm going to allow the testimony to proceed, *and the parties can put on what they believe is important*; and then, ultimately, I'll make a ruling on it. But at this juncture, this issue stays in front of the Court.

4 RP at 576 (emphasis added).

¶17 Later that day, Ken moved for certification from the trial court to allow interlocutory review on the issue of Rochelle's challenge to the promissory note's validity. Rochelle's response suggested to the court that there was a broad spectrum of financial misdealing by Ken during the marriage:

Your honor, Counsel has never understood our position. I am not asking you to set aside anything. You have no authority or power to set aside a foreclosure proceeding or any kind of default order. *What you do have the right to consider, however, is waste, self-dealing, and a relationship between these parties as it directly impacts community assets and property.* That's what I'm asking you to do. I think it goes directly to the heart of how [Rochelle] has been abused financially, within the context of this marriage. . . . *[T]his Court has a broad range of remedies that you can employ in order to straighten out what I believe the proof will show.* . . . I am going to ask you to make specific findings with regard to the self-dealing between one of the parties to this dissolution and his parents with regard to marital assets. That's all that's being asked of this Court.

4 RP at 660-61 (emphasis added).

¶18 The trial court denied Ken's motion. Ken, Rochelle, and Ken's father all testified about the circumstances of the note.

## C. Trial Court's Decision

¶19 The court did not revisit whether it could consider Rochelle's challenge to the foreclosure proceedings following the full presentation of Rochelle's claims and the evidence. Instead, the court recalculated the debt underly-

ing the promissory note and found that when Ken and Rochelle signed the October 1997 promissory note, the debt was approximately $500,000, not $850,000. The court calculated this amount from Ken's parents' check registers from 1989 to 1997 reflected in Exhibit 50 under Ken's ER 904 filing. The court acknowledged that "Exhibit 50, even though it's not the best evidence, it is the only evidence" and that the evidence "was not calculated until recently through this proceeding. The parties never kept track of the exact figures." 2 CP at 203. The court then found the current debt, i.e., debt at time of trial, totaled $900,000, after adding the note's seven percent interest beginning in January 1997, and "$100,000 of loans that the elder Kaseburgs ended up having to be responsible for due to the foreclosure." 2 CP at 203.

¶20 The court also determined that the value of the Snag Island home was $1.2 million based on the testimony of a real estate/insurance agent and the parties' estimates of the value of the home.[5] The court rejected a certified real estate appraiser's testimony and Pierce County's tax assessment that valued this home at approximately half of this amount.[6]

¶21 Using its two figures, the court found a net community property interest of $300,000 in the Snag Island home. The court also determined that Ken committed waste, fraud, and financial misconduct regarding the October 1997 promissory note based on the following facts: (1) Ken controlled both the couple's finances and the home's construction, (2) Ken breached his duty to the community by failing to keep track of the debt underlying the promissory note, (3) Ken did not rebut Rochelle's testimony that "[Ken] was surprised in 2000 when he found out the note was $850,000" (2 CP at 203), (4) Ken's testimony regarding the note was equivocal, (5) Ken's father testified that "he had no intention of calling the note unless a dissolution was filed"

---

[5] Ken valued the home at $900,000 and Rochelle at $1.2 million.

[6] The court required the parties to obtain market appraisals of the home after the trial began.

(2 CP at 203), (6) Ken's father threatened to call the note when the couple separated in 2000 and actually called the note in 2002 after the dissolution petition was filed, and (7) Ken and his parents' control of the debt underlying the note was part of "the financial abuse that went on in this case." 2 CP at 204.

¶22 The court then concluded:

*[Rochelle] lost her community property interest in [the Snag Island home].* She's clearly an innocent spouse. . . . *She's been defrauded out of her community property share. It's clear from the testimony there wouldn't have been a foreclosure unless there was a divorce.* This is another control feature.

. . . .

Due to the husband's misconduct, breach of fiduciary duty to the community, failure to keep track of the note, and signed for more than money owed. There was a *deliberate waste of community asset* in the sense that the husband gave [the Snag Island home] back to the parents and he still gets the benefit of the asset and lives there for free.

2 CP at 205-06 (emphasis added).

¶23 The court awarded a $150,000 judgment to Rochelle, identifying it as one-half of the court's calculation of the net community interest in the Snag Island home. The court divided additional community and separate property, entered a parenting plan awarding Rochelle primary residential care, and provided for child support. The court also found that Ken committed domestic violence during the marriage and that Ken's abusive use of conflict required restriction of his time with the children.

## ANALYSIS

¶24 Ken now specifically challenges the portion of finding of fact 2.20 that determined he committed waste and fraud regarding the debt secured by the October 1997 promissory note and deed of trust on the Snag Island home. Rochelle argues that the trial court properly exercised its broad discretion to evaluate the circumstances of Ken's

alleged waste and concealment of the actual amount of the debt. Rochelle consistently asserts that Ken fraudulently transferred the Snag Island home to his parents.

■ ¶25 Ken does not challenge the trial court's other determinations under finding of fact 2.20 involving Ken's history of domestic violence and his abusive use of conflict. And he does not challenge the court's characterization of the Snag Island home as community property, distribution of additional separate and community property, the parenting plan, and the child support order. Thus, we do not review these issues and they are verities on appeal. *In re Marriage of Fiorito*, 112 Wn. App. 657, 665, 50 P.3d 298 (2002).

## I. APPLICABLE LEGAL STANDARDS

■■ ¶26 A trial court has broad discretion under RCW 26.09.080 to evaluate and distribute the parties' property and liabilities. *In re Marriage of Brewer*, 137 Wn.2d 756, 769, 976 P.2d 102 (1999). We apply a manifest abuse of discretion standard to the trial court's dissolution rulings. *Brewer*, 137 Wn.2d at 769. The trial court manifestly abuses its discretion if it makes an untenable or unreasonable decision. *In re Marriage of Tower*, 55 Wn. App. 697, 700, 780 P.2d 863 (1989).

■■ ¶27 In evaluating the parties' property in a dissolution proceeding, "the trial court may properly consider a spouse's waste or concealment of assets." *In re Marriage of Wallace*, 111 Wn. App. 697, 708, 45 P.3d 1131 (2002), *review denied*, 148 Wn.2d 1011 (2003). But it is well settled that, "[w]hen exercising this broad discretion, a trial court focuses on the assets then before it—i.e., on the parties' assets at the time of trial. If one or both parties disposed of an asset before trial, the court simply has no ability to distribute that asset at trial." *In re Marriage of White*, 105 Wn. App. 545, 549, 20 P.3d 481 (2001) (footnote omitted).

## II. FRAUD CLAIM

¶28 We first address Ken's contention that the court's $150,000 judgment to Rochelle is a damages award for a fraud claim that she did not properly plead. Rochelle did argue below that Ken fraudulently transferred the Snag Island home to his parents.

■ ¶29 But the court's finding of fact 2.20 explaining the $150,000 award is lengthy, occasionally confusing, and applies the elements of fraud in a cursory manner. And the record demonstrates that the court primarily (1) viewed the award as an equitable share of Rochelle's community interest in the Snag Island property and (2) based the award on its perceived ability to evaluate whether Ken concealed the amount of the October 1997 note and wasted the family home. Further, Rochelle did not file a separate tort action.[7] Given the record here, we disagree with Ken's characterization of the court's $150,000 judgment to Rochelle as a damages award for a fraud claim. Further, Ken's argument is not dispositive to our analysis.

## III. EFFECT OF UNCHALLENGED AND STATUTORILY PROPER FORECLOSURE PROCEEDINGS

¶30 We next review whether the trial court properly considered Rochelle's challenge to the October 1997 promissory note's accuracy. Generally, the court can exercise its equitable powers and evaluate whether a party wasted or concealed community assets. *See, e.g, Wallace*, 111 Wn. App. at 708. When the court decided to consider Rochelle's allegations, it characterized the evidence of Ken's waste

---

[7] An equitable action for dissolution cannot be joined or tried with a legal tort or fraud claim. RCW 26.09.050(1); *see also In re Marriage of J.T.*, 77 Wn. App. 361, 362-63, 891 P.2d 729 (1995) (fraud and dissolution actions tried separately); *Plankel v. Plankel*, 68 Wn. App. 89, 95, 841 P.2d 1309 (1992) (rejecting respondent's suggestion that "consolidation of the interspousal tort and dissolution actions is workable or desirable"). There is no right to a jury trial in a dissolution action and the court cannot consider a party's fault, such as immoral or abusive conduct. RCW 26.09.010(1), .080. A tort claimant is typically entitled to a jury trial and the plaintiff must prove fault, negligence, or strict liability. *Edgar v. City of Tacoma*, 129 Wn.2d 621, 627-28, 919 P.2d 1236 (1996); *see also* CR 38.

and concealment of community assets as varied and broad; however, the proffered evidence throughout the trial focused on the debt recited in the October 1997 note that was secured by the deed of trust on the Snag Island home.

A. Deeds of Trust Act

¶31 The deeds of trust act sets out the procedures that must be followed to properly foreclose a debt secured by a deed of trust. Chapter 61.24 RCW. The notice of a potential foreclosure sale must comply with RCW 61.24.040. And the effect of a proper foreclosure action extinguishes the debt and transfers title to the property to the beneficiary of the deed of trust or to the successful bidder at the public foreclosure sale. RCW 61.24.100.

¶32 The Act provides the sole method to contest and enjoin a foreclosure sale under RCW 61.24.130(1). A person waives the right to contest the underlying obligations on the property in foreclosure proceedings when there is no attempt to employ the presale remedies under RCW 61.24.130. *Steward v. Good*, 51 Wn. App. 509, 515-17, 754 P.2d 150 (1988); *see also Olsen v. Pesarik*, 118 Wn. App. 688, 693, 77 P.3d 385 (2003).

¶33 As stated in *Country Express Stores, Inc. v. Sims*, "[f]ailure to pursue presale remedies when a party has knowledge of a basis for setting aside the sale before the sale constitutes a waiver." 87 Wn. App. 741, 750, 943 P.2d 374 (1997). Thus, waiver occurs "whenever the party (1) received notice of the right to enjoin the trustee's sale, (2) had actual or constructive knowledge of a defense to foreclosure prior to the sale, and (3) failed to bring an action to enjoin the sale." *Country Express Stores*, 87 Wn. App at 751 (citations omitted). Further, the court in *Country Express Stores* noted that "the statutory notices of foreclosure and trustee's sale will usually be sufficient." 87 Wn. App at 751. And in *Plein v. Lackey,* our Supreme Court recently emphasized agreement with the Act's "waiver rule" as defined in *Country Express Stores* and *Steward*. 149 Wn.2d 214, 229, 67 P.3d 1061 (2003).

■ ¶34 Here, Rochelle does not dispute that the notice of default she received complied with the Act. It is also undisputed that Rochelle had notice and knowledge of the foreclosure proceedings against the Snag Island home, but she chose not to contest them in any manner. Under these circumstances, Rochelle waived the opportunity to contest the underlying debt and the transfer of the Snag Island home to Ken's parents through the foreclosure action. Because the debt shown in the October 1997 promissory note and the community interest in the home were legally extinguished in the foreclosure sale, the amount of the debt and the value of the real property were not before the trial court for valuation or distribution in the dissolution proceeding. *White*, 105 Wn. App. at 549.

¶35 Although the court correctly stated that it could not interfere with rights arising from the foreclosure sale,[8] its decision to recalculate the debt and the value of the Snag Island home, and then to divide equity in the home at the conclusion of the dissolution action, contradicted its statements.

¶36 Consequently, the trial court manifestly abused its discretion when it allowed Rochelle to collaterally attack the foreclosure proceedings by asserting that the debt was inflated and by asking that the trial court award her a money judgment as her interest in property that did not belong to the community at the time of trial. It was a further abuse of discretion to recalculate and hear extensive witness testimony about the extinguished debt, to determine the value of the real property based on appraisals done after the foreclosure,[9] and to award Rochelle a

---

[8] *See* RP (Nov. 5, 2003) at 39 ("I don't have any jurisdiction over the elder Kaseburgs. I'm not going to overturn the Deed of Trust foreclosure or involve this Court in it in any way. . . . [T]he Court [is not] going to interfere in what [foreclosure] orders have already been entered in regard to [the Snag Island home].").

[9] Although not raised on appeal and the Snag Island home was not before the court for distribution, we note that the trial court erred in how it determined the value of this property. The court relied on the testimony of a real estate/insurance agent hired by Rochelle, but the written appraisal did not comply with RCW

$150,000 judgment as her portion of the community's former interest in that real property.

## B. Waste and Alleged Concealment

■ ■ ¶37 The court also based its decision on waste; but Ken's conduct was not wasteful. Ken did not willfully destroy or recklessly damage the home. And contrary to the court's finding, his living in the home after separation does not constitute waste. Rather, Ken supervised the construction of a large dream home that he, Rochelle, and their children lived in and enjoyed for over five years before the dissolution action, largely due to money received from Ken's parents.

¶38 Rochelle argues that *Wallace* supports the $150,000 award because *Wallace* involved a "similar situation." Br. of Resp't at 5; 111 Wn. App. at 706. Although we agree with *Wallace*'s general legal principles, the facts in *Wallace* are distinguishable. In *Wallace*, the husband conceded on appeal to fraudulent conduct regarding property transfers to his father. 111 Wn. App. at 707 n.3. Indeed, the primary fraudulent transfer in *Wallace* concerned a property quit claimed without notice to the wife, in violation of RCW 26.16.030(3). 111 Wn. App. at 706. In *Wallace*, "the record is replete with evidence that [the husband] committed waste and attempted to conceal assets." 111 Wn. App. at 708. Unlike *Wallace*'s extensive evidence of fiscal misconduct, Rochelle's evidence focused exclusively on the alleged inflation of a debt that was extinguished in a valid foreclosure action that she had notice of and did not challenge. The numerous instances of fraud and fiscal misconduct in *Wallace* are not present here.

---

18.140.020. The court rejected the testimony of a certified real estate appraiser as well as the county's assessed value at approximately one-half of the value testified to by the real estate/insurance agent. RCW 18.140.020. Parties are entitled to give their opinion of value of their assets and the court has considerable discretion in valuing property. *In re Marriage of Gillespie*, 89 Wn. App. 390, 403, 948 P.2d 1338 (1997). But here, the value the trial court placed on the Snag Island home was based exclusively on an opinion and appraisal that did not comply with RCW 18.140.020.

¶39 Finally, we note that even if the Snag Island home was before the court for distribution, the evidence fails to support the court's findings that Ken committed fiscal mismanagement, waste, or in any other way concealed the actual amount of the debt to his parents.[10] And the record does not support the court's cursory discussion of the nine elements of common law fraud and misrepresentation. *See, e.g., Stiley v. Block*, 130 Wn.2d 486, 505, 925 P.2d 194 (1996).

¶40 Ken's parents supported Ken and Rochelle's high standard of living with numerous informal loans and gifts, including an unchallenged promissory note secured by the Normandy Park home. Given Ken and Rochelle's long-standing financial dependence on Ken's parents, Ken's inability to provide exact details of the debt that they both admitted was $850,000 in 1997, among the many other loans and gifts, is not fiscal concealment, mismanagement, or breach of any fiduciary responsibility owed to the community. Further, both Ken and Rochelle owed a fiduciary responsibility to the community since both had management rights and responsibilities and both executed the note and the deed of trust in 1997 for the benefit of the community. RCW 26.16.030.

¶41 In summary, we affirm the general principle that in a dissolution action a court has discretion to consider allegations of concealment, fiscal misconduct, and waste of community debts and assets. But we hold that it is an abuse of discretion to allow a challenge on these grounds when the allegations and evidence focus on debts and property that are not before the dissolution court and are extinguished because of a statutorily proper and unchallenged foreclosure action under chapter 61.24 RCW.

---

[10] For example, Rochelle first claimed that her signature on the note was forged, and then she testified that the October 1997 note was for $350,000, not $850,000. But it is undisputed that her own expert testified to the note's authenticity, including her signature.

IV. Attorney Fees

¶42 Rochelle requests attorney fees for the costs of her appeal, but provides neither legal authority nor argument to support her claim. Thus, we deny the request. *See* RAP 18.1(b) (party must provide sufficient argument and citation to legal authority to advise the court of the appropriate grounds for attorney fees); *Austin v. U.S. Bank of Wash.*, 73 Wn. App. 293, 313, 869 P.2d 404 (1994).

¶43 We reverse and vacate the trial court's award of $150,000 to Rochelle, as well as the court's findings of fraud, waste, concealment, financial mismanagement, breach of fiduciary duty, or other fiscal misconduct by Ken regarding the Snag Island home.

Quinn-Brintnall, C.J., and Morgan, J., concur.