FILED
COURT OF APPEALS
DIVISION II

2014 JUN -3 AM 8: 33

STATE OF WASHINGTON

BY:_____
                DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KARA UNDERWOOD, | No. 44068-7-II |
| Respondent, | |
| v. | |
| ROBERT UNDERWOOD, | PART-PUBLISHED OPINION |
| Appellant. | |

MAXA, J. – Robert Underwood appeals multiple trial court orders entered in proceedings related to the dissolution of his marriage to Kara Underwood. We hold that the trial court erred in allowing the parties' two teenage children to determine the amount of their residential time with Robert[1] without supporting that decision with appropriate findings. In the unpublished portion of this opinion we address the remainder of Robert's arguments. We affirm in part, reverse in part, and remand for further proceedings. We also award Kara her attorney fees on appeal.

## FACTS

Kara and Robert Underwood married in Montana in 1991. They have two children. In 2010, Kara petitioned for dissolution of her marriage to Robert. At the time, their older child was 14 and their younger child was 12. After a bench trial, the trial court entered a final parenting plan that allowed the children to decide whether Robert would have residential time with them. The trial court stated:

---

[1] The parties' first names are used for clarity. By using first names, we mean no disrespect.

[T]he [children] are mature and intelligent. Due to this, along with the age of the children, the residential time between [them] and their father in the future shall be based on the desires of the [children]. At present they have no desire to have contact with their father. The court will honor their wishes. They will be allowed to have contact with their father and residential time if they later cho[o]se to.

Clerk's Papers (CP) at 35. Robert appeals this ruling, as well as several other trial court orders addressed in the unpublished portion of this opinion.

## ANALYSIS

We review a trial court's parenting plan for abuse of discretion. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012), *cert. denied* 133 S. Ct. 889 (2013). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *Katare*, 175 Wn.2d at 35.

Robert argues that the trial court abused its discretion when it allowed the children to decide whether he would receive any residential time with them because this ruling effectively eliminated his residential time with them. We hold that although under certain circumstances and in its discretion the trial court may allow a child to determine the amount of residential time with the non-custodial parent, it may do so only based on appropriate findings. Because the trial court did not make adequate findings supporting its decision here, we must remand for reconsideration of this issue.

The trial court did not expressly order the elimination of Robert's residential time with the children. However, it acknowledged that the children did not desire to have contact with their father at that time. As a result, the trial court knew that its parenting plan likely would result in the elimination of Robert's residential time for the foreseeable future. The question here is whether the trial court had the discretion to allow the children to determine the amount of their

residential time with Robert, knowing that this decision effectively would eliminate Robert's residential time with them.

Although the trial court did not explain the basis for its ruling on residential time, it apparently viewed its order as a limitation on residential time justified by its findings under RCW 26.09.191(2) and (3). RCW 26.09.191(2)(a) requires *limitation* of residential time if the parent has engaged in certain conduct. The trial court determined that Robert had engaged in two types of conduct referenced in the statute: a history of acts of domestic violence as defined in RCW 26.50.010(1) and emotional abuse of a child. But RCW 26.09.191(2)(a) does not give the trial court authority to *eliminate* residential time. That authority is granted by other subsections of RCW 26.09.191.

RCW 26.09.191(2)(m)(i), for example, provides:

> If the court expressly finds based on the evidence that limitations on the residential time with the child will not adequately protect the child from the harm or abuse that could result if the child has contact with the parent requesting residential time, the court shall restrain the parent requesting residential time from all contact with the child.

There is no question here that express findings regarding protecting the children from harm or abuse would have been required if the trial court had explicitly eliminated Robert's residential time under RCW 26.09.191(2)(m)(i), and that the trial court made no such findings.

A different subsection, RCW 26.09.191(3), authorizes a trial court to completely preclude a parent's residential time if certain factors exist. The trial court found three of these factors present in this case: (1) a long-term emotional or physical impairment that interferes with the performance of parenting functions as defined in RCW 26.09.004, (2) the absence or substantial impairment of emotional ties between the parent and child, and (3) the abusive use of conflict by

the parent that has damaged the children's psychological development. Based on these findings, the trial court had discretionary authority under RCW 26.09.191(3) to enter an order that effectively eliminated Robert's residential time with the children.

However, the trial court's exercise of discretion to essentially eliminate a parent's residential time must be exercised in the context of other important considerations. First, the legislature has expressed a policy favoring maintaining relationships between parents and children when setting a residential schedule in a dissolution action. RCW 26.09.002 provides that "[t]he state recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and that the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests." Further, RCW 26.09.187(3)(a) provides that the trial court should make residential provisions for children that "encourage each parent to maintain a loving, stable, and nurturing relationship with the child." The trial court must consider these policy directives before effectively eliminating residential time based solely on RCW 26.09.191(3) factors.

Second, parents have a fundamental liberty interest in the "care, custody and management of their children." *In re Dependency of J.H.*, 117 Wn.2d 460, 473, 815 P.2d 1380 (1991). A trial court also must consider this liberty interest before effectively eliminating a parent's residential time with his or her children based solely on the RCW 26.09.191(3) factors.

Because of these compelling interests in protecting a parent's residential time with his or her children, we hold that (1) an order allowing a child to decide whether to have any residential time with the non-custodial parent based solely on the RCW 26.09.191(3) factors should be reserved for situations where the trial court articulates specific reasons for such an order and (2)

before allowing a child to decide whether to have any residential time with the non-custodial parent based solely on the RCW 26.09.191(3) factors, the trial court must enter detailed findings supporting and providing the basis for its decision.

Here, the trial court's only finding was that the children were "mature and intelligent." The trial court also made a non-specific reference to the ages of the children, 15 and 12. But the trial court did not explain why these children's maturity, intelligence, and ages supported its decision. The trial court also did not explain why the RCW 26.09.191(3) factors supported effectively eliminating Robert's residential time. Finally, despite their age difference, the trial court did not make specific findings regarding each child individually. The trial court's minimal statements on this issue were insufficient to support its decision to allow the children to decide whether to have any residential time with Robert.

We recognize that one of the children is now over the age of 18 and no longer is subject to the parenting plan, and that the second child is now 16. In addition, over 18 months have passed since the trial court entered its parenting plan and circumstances may have changed. Accordingly, we remand this matter to the trial court for reconsideration of this residential time issue and a determination of whether it is still appropriate to allow the remaining minor child to decide whether to have any residential time with Robert. If the trial court again allows the child to decide whether to have residential time with Robert, it must enter appropriate findings supporting and providing a basis for that determination.

We consider Robert's remaining arguments in the unpublished portion of this opinion. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

In the unpublished portion of this opinion, we hold that

(1) Robert consented to jurisdiction over the division of his military pension under the Uniform Services Former Spouses' Protection Act (USFSPA), 10 U.S.C. § 1408(c)(1), because he admitted jurisdiction in his answer to the dissolution petition and requested affirmative relief;

(2) any violation of the stay entered under the Servicemembers Civil Relief Act (SCRA), 50 U.S.C. App. § 522, was harmless error;

(3) the trial court improperly found that Robert's acts of financial and emotional exploitation were domestic violence for purposes of RCW 26.09.191(2), but the record supported a finding that Robert engaged in domestic violence;

(4) the trial court erred in failing to make the required findings to waive relocation notice requirements under RCW 26.09.460(4)[2];

(5) the provision in the restraining order restricting Robert's use of a firearm was proper under 18 U.S.C. § 922(g)(8) because he was subject to an order restraining him from harassing, stalking, or threatening an intimate partner;

(6) the trial court inappropriately relied on evidence of lost profits from a failed property transaction when awarding Kara a lien, but correctly determined that Kara had a community interest in the parties' real property on which the lien was placed;

---

[2] We do not address other restrictions in the parenting plan because Robert failed to assign error to those portions of the plan.

(7) requiring Robert to name Kara as the beneficiary of the survivor benefit plan and to maintain life insurance did not amount to a double recovery of retirement benefits because the life insurance also secured child support and other community obligations;

(8) the trial court did not abuse its discretion in not considering Robert's cost of selling property and requiring him to pay Kara's separate credit card debt;

(9) sufficient evidence regarding the parties' needs and abilities to pay supported the trial court's maintenance award;

(10) the trial court erred in awarding Kara lifetime maintenance of $1.00 per month as a placeholder to retain jurisdiction; and

(11) the evidence supporting the trial court's maintenance award regarding need and ability to pay supports the trial court's attorney fee award to Kara.

We also award Kara her attorney fees on appeal.

## ADDITIONAL FACTS

Robert was a member of the military and was stationed in multiple locations during the marriage. Kara and the children frequently moved with him. The parties lived in Washington for certain portions of this time.

*Property Acquisition*

In 1995, Kara and Robert agreed to purchase property in Montana from Robert's grandparents and began making monthly payments. After Robert's grandparents died in 2005, the parties realized that the property was part of Robert's family trust and the parties sued the trust to gain access to the property. The result was that the trust was dissolved; the trust property, including the property the parties had supposedly purchased, was sold; the parties were

refunded the money they had paid for the property; and Robert received a payment for his share of the trust.

Using Robert's payment from the trust and proceeds from the sale of a community property home in Steilacoom, the parties purchased two parcels of property in Cheney, Washington. One of the properties was secured by a mortgage that the parties paid with joint earnings during the marriage. The parties completed an extensive remodel on the home on this property, which they paid for through a home equity line of credit that they repaid out of joint earnings. Although the parties rented out the other Cheney property, the rental income did not cover the property's expenses, and the uncovered expenses were paid out of community funds. Kara performed physical labor on this rented property and managed the property.

In 2008, the parties sold one of the Cheney properties and used the proceeds to purchase property in Montana. The parties took out a mortgage on the Montana property and made the payments out of joint earnings. The parties also paid all of the property's expenses out of joint earnings and made alterations and repairs to the property.

*Dissolution Proceedings*

In 2010, while the parties and the children were living in Naples, Italy, the parties decided to separate. Kara and the children planned to move to Tacoma in June, but they returned to the United States in February because, according to Kara, Robert had been emotionally abusing and exercising control over her and the children that had become "unbearable." Report of Proceedings (RP) at 35. Before Kara was able to leave, Robert reported all of her credit cards as stolen and took her passport. Kara said she was "basically being held prisoner there." RP at 36.

On March 25, 2010, Kara petitioned for dissolution in Pierce County Superior Court. On June 15, the trial court entered a temporary parenting plan under which the children would reside with Kara but would spend every other weekend and every Wednesday with Robert when he resided near the children. If Robert did not reside near the children, he would be entitled to reasonable residential time with them upon giving two weeks' notice to Kara. The trial court also entered orders for child support, maintenance, attorney fees, appointment of a guardian ad litem, tax exemptions, and disposition of the Montana property.

On September 10, Robert moved to vacate these June 15 orders. He made extensive arguments challenging the orders, including a claim that the trial court did not have jurisdiction over him under the USFSPA because he was on active military duty in Italy at the time the orders were entered and was a resident of Montana. The trial court determined that it had jurisdiction over the dissolution.

In November, Robert was notified that he would be deployed to Afghanistan until August 2011. On December 27, he moved to stay the dissolution proceedings under the SCRA because his ability to defend the action was materially affected by his deployment. The trial court granted the motion and ordered that the proceedings be stayed until September 30, 2011. On July 27, Robert moved to lift the stay because he had retained an attorney in the United States. The trial court granted the motion and directed the clerk to issue a new case schedule.

*Final Resolution*

The trial court concluded that it had jurisdiction over Robert because the parties lived in Washington during their marriage and because Kara continued to reside in Washington. On September 14, after a bench trial, the trial court issued the following orders: (1) a permanent

restraining order against Robert that also prohibited him from possessing a firearm, (2) a final parenting plan, (3) a final order of child support, (4) a decree of dissolution, and (5) findings of fact and conclusions of law. The trial court ordered Robert to pay Kara's costs and attorney fees, totaling $30,000. Robert appeals.

ANALYSIS

A.     JURISDICTION OVER MILITARY PENSION

Robert argues that the trial court did not have jurisdiction over the division of his military pension under the Uniform Services Former Spouses' Protection Act (USFSPA), 10 U.S.C. § 1408(c)(1), because as of the date of dissolution he neither resided nor was domiciled in Washington. We hold that Robert consented to jurisdiction in Washington, and therefore cannot argue otherwise on appeal.

1.     Statutory Framework

When the underlying facts are undisputed, whether a trial court has jurisdiction is a question of law, which we review de novo. *Conom v. Snohomish County*, 155 Wn.2d 154, 157, 118 P.3d 344 (2005) (subject matter jurisdiction); *Lewis v. Bours*, 119 Wn.2d 667, 669, 835 P.2d 221 (1992) (personal jurisdiction). We review Robert's jurisdictional challenge here under the specific terms of the USFSPA because the federal statute generally preempts state rules regarding jurisdiction when military pensions are concerned. U.S. CONST. art. VI, cl. 2; *see also In re Marriage of Booker*, 833 P.2d 734, 739 (Colo. 1992).

The trial court's authority to divide Robert's military pension derives from the USFSPA. *In re Marriage of Peck*, 82 Wn. App. 809, 813-14, 920 P.2d 236 (1996). Under the USFSPA, state courts may treat certain military retirement pay as community property subject to division

in dissolution actions. 10 U.S.C. § 1408(c)(1); *In re Marriage of Jennings*, 138 Wn.2d 612, 622, 980 P.2d 1248 (1999). For military retirement pay to be before the court in a dissolution action, state courts must obtain jurisdiction over military members in one of the ways enumerated in 10 U.S.C. § 1408(c)(4). Under 10 U.S.C. § 1408(c)(4), a trial court has jurisdiction over the disposable retired or retainer pay of a service member by reason of: "(A) his residence, other than because of military assignment, in the territorial jurisdiction of the court, (B) his domicile in the territorial jurisdiction of the court, or (C) his consent to the jurisdiction of the court."

2. Consent to Jurisdiction

Kara argues that Robert consented to the court's jurisdiction in Washington in his response to her petition for dissolution. Robert argues that he did not consent to jurisdiction because he objected to jurisdiction in his motion to vacate the trial court's temporary parenting plan and related orders. We agree with Kara that Robert consented to jurisdiction.

Consent to jurisdiction for the purposes of the USFSPA may be implied by a military service member's general appearance in court. *Peck*, 82 Wn. App. at 814. Even where the service member has objected to personal jurisdiction, " 'he may waive the defense of lack of jurisdiction by seeking affirmative relief, thereby invoking the jurisdiction of the court.' " *Peck*, 82 Wn. App. at 814 (quoting *In re Marriage of Parks*, 48 Wn. App. 166, 170, 737 P.2d 1316 (1987)).[3]

Here, in paragraph 1.7 of Kara's petition for dissolution, she alleged that the trial court had jurisdiction over Robert because she and Robert "lived in Washington during their marriage

---

[3] In *Peck*, we found no consent when the service member asserted in his answer that the court did not have jurisdiction and continued to contest jurisdiction in later pleadings. 82 Wn. App. at 814-15.

and [she] continues to reside . . . in this state." CP at 2. In his June 9, 2010 response to the petition, Robert *admitted* this assertion in paragraph 1.7. He also requested affirmative relief – that the trial court enter a dissolution decree, approve his parenting plan, determine support for the children under the child support schedule, dispose of his property and liabilities according to his proposal, and award him tax exemptions for the children. And Robert did not contest jurisdiction until over five months after Kara filed the petition for dissolution and almost three months after the trial court entered orders unfavorable to him. These actions constitute Robert's consent to jurisdiction in the Washington courts.

Robert argues that he did not consent to jurisdiction because he directed his attorney to contest jurisdiction and his attorney failed to comply with his request. But regardless of whether this assertion is true, unlike in *Peck* Robert also requested multiple forms of affirmative relief in his answer. He then failed to bring his jurisdictional challenge to the trial court's attention until three months after the trial court entered orders unfavorable to him. That Robert later claimed his attorney acted contrary to his wishes in failing to object to jurisdiction in his answer does not negate Robert's demonstrating consent to jurisdiction in Washington by requesting affirmative relief in the dissolution action and waiting until the court had entered substantive orders before contesting jurisdiction.[4]

B.     STAY UNDER THE SCRA

Robert argues that the trial court violated his due process rights when it granted Kara's motion to limit his parental rights during a stay under the Servicemembers Civil Relief Act

---

[4] Kara also argues that the trial court had jurisdiction over Robert under Washington's long-arm statute, RCW 4.28.185. Because we hold that Robert consented to jurisdiction, we need not address this issue. We also need not address whether Washington was Robert's residence or domicile under the USFSPA.

(SCRA), 50 U.S.C. App. § 522. We hold that to the extent the trial court did violate the stay, any violation was harmless.

Under the SCRA, a service member may obtain a stay "[a]t any stage before final judgment in a civil action or proceeding." 50 U.S.C. App. § 522(b)(1). The purpose of the SCRA " 'is to suspend enforcement of civil liabilities of persons in the military service of the United States in order to enable such persons to devote their entire energy to the defense needs of the Nation.' " *In re Marriage of Herridge*, 169 Wn. App. 290, 297, 279 P.3d 956 (2012) (quoting *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir.1995)); *see also* 50 U.S.C. App. § 502(2) (purpose of SCRA is "to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service"). The provisions of the SCRA are to be liberally construed. *Herridge*, 169 Wn. App. at 297. But the SCRA " 'is not to be used as a sword against persons with legitimate claims,' and a court must give 'equitable consideration of the rights of parties to the end that their respective interests may be properly conserved.' " *Herridge*, 169 Wn. App. at 197 (quoting *Engstrom*, 47 F.3d at 1462).

Here, Robert moved for a stay of proceedings under the SCRA before he was deployed to Afghanistan. On January 6, 2011, the trial court granted the motion and ordered that proceedings be stayed until September 30, 2011. But on March 31, Kara moved for an order requiring Robert to undergo a mental health evaluation and requiring any residential time with Robert to take place in Pierce County until the mental health evaluation had been completed. On April 15, the trial court continued the motion for a mental health evaluation until Robert was available or when the stay was lifted, whichever was sooner. The trial court further ruled, "Prior to Robert . .

. exercising any residential time with the children of this marriage, [Kara]'s motion for a mental health evaluation shall be heard." CP at 151.

Robert claims that the trial court violated the stay because it restricted his residential time with the children pending the hearing on whether a mental health evaluation should be ordered. However, Robert fails to show how this restriction on his residential time prejudiced him. The trial court restricted Robert's residential time with the children on April 15 pending his availability for a hearing on the necessity of a mental health evaluation. But Robert was out of the country at that time. And even though Robert did not have a mental health evaluation, when Robert returned to Washington the trial court awarded him residential time with the children for four days beginning on June 24. The court further ordered that if the visits went well, Robert would have residential time with the children in Montana from June 28 until July 8, 2011. These visits took place. Robert does not allege that he planned or was available to see the children between the date the trial court restricted residential time, April 15, and the date his residential time was restored, June 23. Therefore, Robert has failed to show how the trial court's limitation on his residential time with the children between April 15 and June 23, pending the mental health hearing, prejudiced him.

We reverse only when an error prejudices a party. *Saleemi v. Doctor's Assocs., Inc.*, 176 Wn.2d 368, 380, 292 P.3d 108 (2013). Because the trial court's temporary departure from the parenting plan during the stay did not prejudice Robert, we hold that any error was harmless.[5]

---

[5] Robert also argues that after the stay was lifted, he had "extreme difficulty" responding to motions to re-determine temporary orders, to compel discovery, and to gain access to property. But Robert fails to show how the trial court violated the SCRA by allowing the case to proceed *after* the stay was lifted.

## C. PARENTING PLAN

Robert challenges multiple provisions in the parenting plan, arguing that (1) there was insufficient evidence supporting restrictions on his residential time under RCW 26.09.191(2), (2) the trial court abused its discretion when it allowed Kara to relocate with the children and waived notice requirements under RCW 26.09.430-.460 and RCW 26.09.520, and (3) the trial court abused its discretion when it restricted the children's contact with Robert's family members and restricted him from possessing pornographic material within the children's sight.

### 1. Standard of Review

As noted above, we review a trial court's parenting plan for abuse of discretion. *Katare* II, 175 Wn.2d at 35. We review findings of fact for substantial evidence, which is evidence sufficient to persuade a fair-minded person of the finding's truth. *Katare* II, 175 Wn.2d at 35. We do not retry the facts on appeal. *In re Marriage of Thomas*, 63 Wn. App. 658, 660, 821 P.2d 1227 (1991). Therefore, we do not review the trial court's credibility determinations or weigh evidence. *In re Marriage of Meredith*, 148 Wn. App. 887, 891 n.1, 201 P.3d 1056 (2009). Unchallenged findings of fact are verities on appeal. *In re Marriage of Fiorito*, 112 Wn. App. 657, 665, 50 P.3d 298 (2002).

### 2. Limitation on Residential Time under RCW 26.09.191

Robert argues that the trial court abused its discretion when it limited his residential time based on RCW 26.09.191. We disagree.

#### a. Legal Principles

Decisions on residential provisions are based on the child's best interests, as found at the time of trial. RCW 26.09.187(3)(a); *In re Marriage of Littlefield*, 133 Wn.2d 39, 52, 940 P.2d

15

1362 (1997). Because the trial court has a unique opportunity to observe the parties, we are " 'extremely reluctant to disturb child placement dispositions.' " *In re Parentage of Schroeder*, 106 Wn. App. 343, 349, 22 P.3d 1280 (2001) (quoting *In re Marriage of Schneider*, 82 Wn. App. 471, 476, 918 P.2d 543 (1996)).

Generally, when creating a permanent parenting plan in a dissolution action, courts will set a residential schedule for the children based on certain statutory considerations. *See* RCW 26.09.187(3). But the statute also provides certain factors that, if present, either impose a mandatory duty on the court to limit residential time (RCW 26.09.191(2)) or permit the trial court to do so within its discretion (RCW 26.09.191(3)). *In re Marriage of Watson*, 132 Wn. App. 222, 232, 130 P.3d 915 (2006). "[A]ny limitations or restrictions imposed must be reasonably calculated to address the identified harm." *In re Marriage of Katare* (*Katare* I), 125 Wn. App. 813, 826, 105 P.3d 44 (2004).

If the trial court finds that one of the parents has engaged in certain conduct specified in RCW 26.09.191(2)(a), the trial court *must* limit that parent's residential time. *Watson*, 132 Wn. App. at 231-32; *see also* RCW 26.09.187(3). Two of those limiting criteria are that the parent has engaged in a history of acts of domestic violence as defined in RCW 26.50.010(1) and emotional abuse of a child. RCW 26.09.191(2)(a).

If the trial court finds the existence of certain other factors under RCW 26.09.191(3), the trial court *may* limit or preclude any provision in the parenting plan if the court finds that "[a] parent's involvement or conduct may have an adverse effect on the child's best interests." *Watson*, 132 Wn. App. at 232. Three of these factors are:

> (b) A long-term emotional or physical impairment which interferes with the parent's performance of parenting functions as defined in RCW 26.09.004;

(d) The absence or substantial impairment of emotional ties between the parent and the child; [and]
(e) The abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development.

RCW 26.09.191(3).

b.    Finding of Domestic Violence

The trial court concluded that Robert's residential time with the children should be limited under RCW 26.09.191(2)(a) because he "engaged in acts of domestic violence by financial and emotional exploitation." CP at 34. Robert argues that the trial court erred when it defined financial and emotional exploitation as domestic violence because it does not appear in the definition of domestic violence in RCW 26.50.010(1). We agree, but affirm the trial court's finding because there was other sufficient evidence of domestic violence.

Whether financial and emotional exploitation falls under the definition of domestic violence in RCW 26.50.010(1) is a matter of statutory interpretation, a question of law that we review de novo. *Advanced Silicon Materials, LLC v. Grant County*, 156 Wn.2d 84, 89, 124 P.3d 294 (2005). The primary goal of statutory interpretation is to ascertain and give effect to the legislature's intent. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Campbell & Gwinn*, 146 Wn.2d at 9–10. "[A]n unambiguous statute is not subject to judicial construction." *Kilian v. Atkinson*, 147 Wn.2d 16, 20, 50 P.3d 638 (2002). "A statute is ambiguous if it can be reasonably interpreted in more than one way, but it is not ambiguous simply because different interpretations are conceivable." *Kilian*, 147 Wn.2d at 20-21.

RCW 26.50.010(1) defines "domestic violence" as "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, between family or household members." RCW 26.50.010(1) is not ambiguous and therefore its meaning is to be derived from the plain language of the statute alone. *Neilson ex rel Crump v. Blanchette*, 149 Wn. App. 111, 116, 201 P.3d 1089 (2009). The plain language of this statute does not include "financial and emotional exploitation." Moreover, there is no authority supporting such a reading. Accordingly, the trial court erred when it determined that Robert had engaged in domestic violence because he had engaged in financial and emotional exploitation.

Even though the trial court erred in this regard, we can affirm a trial court's ruling on any basis supported by the record. *In re Marriage of Rideout*, 150 Wn.2d 337, 358, 77 P.3d 1174 (2003). Here, the record supports a finding that Robert engaged in domestic violence because he inflicted "fear of imminent physical harm, bodily injury or assault." RCW 26.50.010(1). Kara testified that after Robert filed for divorce in 2006, he ran his truck into her moving van when she was trying to move her things out of the house and he threatened to kill a man, and she had a restraining order entered against him because of the incident. Kara also testified that during their marriage Robert "made me pay for a mistake that I made in the marriage, and that included an all night interrogation." RP at 208. In response to a question about whether Robert was an intimidating person, Kara responded, "When someone is posturing over you, spitting in your face, keeping you up all night long, throwing t[h]ings through windows, has weapons, is a ranger trained in the military, yes, he's a threatening person, intimidating person." RP at 207-08.

In 2012, Robert was charged with felony harassment for allegedly hiring a hit man to kill Kara[6]. Kara testified that after hearing that Robert had threatened to have her killed, she feared for her safety and "absolutely was in fear of my life." RP at 202-03. She further testified, "I had my concerns about what [Robert] was going to do when he came here, based on his threats to me via email, saying I would pay. That when he got there, things were going to be different." RP at 203. For two years during the parties' separation, Robert sent threatening communications to Kara. Kara testified that "[a]fter two years of hearing that I was going to pay when he returned, he was returning the following month and I was very concerned, still am, about his state of mind and what he will do." RP at 206.

There is ample evidence in the record that Robert had engaged in a history of domestic violence by inflicting fear of imminent physical harm, bodily injury, or assault. RCW 26.50.010(1). Nevertheless, the trial court made no findings regarding Robert's infliction of fear of imminent harm. In *Katare* I, Division One of this court ruled that the trial court must make express findings under RCW 26.09.191 in order to impose limitations in a parenting plan. 125 Wn. App. at 826. However, our Supreme Court recently clarified that the holding in *Katare* I was that "restrictions entered in a parenting plan pursuant to *RCW 26.09.191(3)* must be supported by an express finding that the parent's conduct is adverse to the best interest of the child." *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012), *cert. denied* 133 S. Ct. 889 (*Katare* II), 175 Wn.2d at 32 (emphasis added). The court in *Katare* II further stated that the court in *Katare* I remanded to the trial court to resolve an ambiguity created by the trial court's finding that RCW 26.09.191(3) did not apply. 175 Wn.2d at 32.

---

[6] This harassment charge ultimately was dismissed.

Here, the trial court's restriction on residential time due to domestic violence was a limiting factor under RCW 26.09.191(2)(a), not RCW 26.09.191(3). And here, unlike in *Katare I*, there is no ambiguity in the trial court's ruling. The trial court found that Robert had a history of domestic violence. That finding is supported by the record. Therefore, the rule in *Katare I* is inapplicable here and does not change the rule that we may affirm on any basis supported by the record.

Although the trial court erred in ruling that financial and emotional exploitation constituted domestic violence, we affirm the trial court's finding of domestic violence based on evidence that Robert inflicted fear of imminent physical harm, bodily injury, or assault.

    c.    Emotional Abuse of a Child

The trial court also stated that its decision to limit residential time was based on emotional abuse of a child, which is another mandatory limiting factor under RCW 26.09.191 (2). The trial court found that Robert "has been abusive to his wife and children. He has bullied and interrogated them, resulting in their desire to have no contact with him." CP at 34. Robert does not assign error to this finding. Accordingly, it is a verity on appeal. *Fiorito*, 112 Wn. App. at 665.

Because the trial court found that Robert emotionally abused the children, it was required to impose limitations on his residential time under RCW 26.09.191(2). Accordingly, even if the trial court erroneously defined "domestic violence," any error the trial court made was harmless because the trial court nevertheless was required to limit Robert's residential time based on emotional abuse of a child.

d. Factors under RCW 26.09.191(3)

The trial court concluded that Robert's residential time could be limited because his involvement with the children may have an adverse effect on their best interests based on the existence of the following factors set forth in RCW 26.09.191(3): (1) a long-term emotional or physical impairment that interferes with the performance of parenting functions as defined in RCW 26.09.004, (2) the absence or substantial impairment of emotional ties between the parent and child, and (3) the abusive use of conflict by the parent that has damaged the children's psychological development. Robert argues that these findings were unsupported, but he has failed to assign error to these findings.

Without including these challenges in his assignments of error, Robert's challenges to these findings in his brief are insufficient. RAP 10.3(g) ("A separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number."). Therefore, we treat them as verities on appeal. *Fiorito*, 112 Wn. App. at 665.[7] These unchallenged findings support the trial court's restrictions on residential time under RCW 26.09.191(3).

3. Relocation Notice

The trial court allowed Kara to relocate with the children without having to give Robert the required notice under RCW 26.09.430-.460 and RCW 26.09.520. Robert argues that the trial court abused its discretion when it allowed Kara to relocate with the children and waived the

---

[7] Regardless of Robert's failure to assign error to the trial court's findings, the record shows that these findings were supported by substantial evidence. In addition, even if these findings were erroneous, the trial court's restriction of Robert's residential time was mandated by the findings of domestic violence and emotional abuse of a child.

notice requirements under RCW 26.09.430-.460 and RCW 26.09.520 without making any findings to support its ruling. We agree.

RCW 26.09.520 provides that a party proposing to relocate with a child must provide reasons for the intended relocation. There is a rebuttable presumption that the intended relocation will be permitted, but the opposing party "may rebut the presumption by demonstrating that the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person" based upon certain factors. RCW 26.09.520. The trial court must consider each factor in RCW 26.09.520 and must either enter written findings on each factor or make an oral ruling supported by substantial evidence on each factor. *In re Marriage of Horner*, 151 Wn.2d 884, 896, 93 P.3d 124 (2004). "[T]he trial court has discretion to grant or deny a relocation after considering the RCW 26.09.520 relocation factors and the interests of the children and their parents." *In re Marriage of Fahey*, 164 Wn. App. 42, 56, 262 P.3d 128 (2011), *review denied*, 173 Wn.2d 1019 (2012).

Generally, the relocating party also must provide notice to the other parent of that party's intent to relocate. RCW 26.09.430. However, a party may request an order waiving notice requirements and the trial court will grant the motion if "the court finds that the health or safety of a person or a child would be unreasonably put at risk by notice or the disclosure of certain information in the notice." RCW 26.09.460(4). Here, the trial court's only finding supporting its ruling that Kara did not need to give Robert notice provided: "[T]he present environment is detrimental to [Kara] and to [the] parties' children. They will benefit from a fresh start in a new community." CP at 39. The trial court did not find that the "health or safety" of the children would have been put at risk by providing notice or disclosing the location of the relocation to

22

Robert. RCW 26.09.460(4). Accordingly, we remand to the trial court to consider this factor and make the required findings if it finds that waiver of notice was appropriate.

4. Other Restrictions on Residential Time

Robert argues that the trial court abused its discretion when it restricted both parties from allowing the children to spend time with their cousin, paternal grandmother, and paternal aunt, and when it restricted him from possessing pornographic material within the children's sight. But Robert does not assign error to these portions of the parenting plan. Accordingly, we need not address these issues. RAP 10.3(g) ("The appellate court will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto.").

D. RESTRAINING ORDER

The trial court imposed a permanent restraining order against Robert because he "has been abusive to his wife and children" and because Kara's testimony established that she had a "very real fear of future acts of domestic violence." CP at 22, 69. Robert argues that the trial court abused its discretion when it entered the restraining order and that the trial court improperly precluded him from owning firearms. We disagree.

A trial court has broad discretion to grant a continuing restraining order where appropriate in a final decree of dissolution: "In entering a decree of dissolution of marriage . . . the court shall . . . make provision for *any necessary continuing restraining orders.*" RCW 26.09.050(1) (emphasis added); 20 Kenneth W. Weber, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 41.3, at 524 (1997). Therefore, we review the trial court's decision to issue a restraining order for abuse of discretion.

RCW 26.09.050(1) allows the trial court to include in its restraining order "the restraint provisions of a domestic violence protection order under chapter 26.50 RCW." The trial court also may include in its restraining order restrictions on firearm possession and use contained in RCW 9.41.800. RCW 26.09.050(1). RCW 9.41.800 provides that a trial court may prohibit the restrained party "from obtaining or possessing a firearm" if there is clear and convincing evidence that a party has "[u]sed, displayed, or threatened to use a firearm or other dangerous weapon in a felony, or previously committed any offense that makes him or her ineligible to possess a firearm under the provisions of RCW 9.41.040."

Here, the trial court entered a restraining order against Robert under RCW 26.09.050(1). In its findings and conclusions, the trial court stated: "A continuing restraining order against the husband is necessary. The court finds that [Robert] has been abusive to his wife and children. The testimony of Kara . . . supports her very real fear of future acts of domestic violence." CP at 69. The protection order also provided that if "the parties are intimate partners as defined under federal law . . . the restrained person may not possess a firearm or ammunition." CP at 23. This provision is contained in the mandatory forms for restraining orders issued under chapter 26.09 RCW. *See* 22A Scott Horenstein WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW HANDBOOK, WPF DR 04.0500, at 287 (2013).

Robert argues that the trial court violated his Second Amendment rights to keep and bear arms when it entered a restraining order restricting him from possessing a firearm. He first argues that there was no evidence of domestic violence supporting the order. However, as discussed above, there was ample evidence in the record to establish that Robert engaged in

24

domestic violence by inflicting fear of imminent physical harm, bodily injury, or assault. *See* RCW 26.50.010(1).

Robert also argues that RCW 9.41.800 did not authorize a restriction on his possession of firearms because there was no evidence that he used, displayed, or threatened to use a firearm in the commission of a felony or that he committed an offense that made him ineligible to possess a firearm under RCW 9.41.040. Robert is correct. However, this was not the basis for the trial court's imposition of a firearm restriction. Rather, the restriction was based on 18 U.S.C. § 922(g)(8), which makes possessing a firearm unlawful for a person subject to a court order that "restrains such person from harassing, stalking, or threatening an intimate partner[8] of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child." The order here prohibited Robert from "harassing or stalking" Kara, and Robert does not show why 18 U.S.C. § 922(g)(8) does not apply to him. Accordingly, we hold that the trial court did not abuse its discretion when it entered a restraining order preventing Robert from possessing a firearm.

E.     PROPERTY DISTRIBUTION

The trial court awarded the Cheney and Montana properties to Robert but found that Kara had a community interest in those properties and awarded her an equitable lien of $112,000 against the Cheney property to compensate her for that interest. The trial court implied that the lien included some amount for the parties' failed property transaction involving property owned by Robert's grandparents. The trial court also required that Robert maintain a life insurance policy payable to Kara until he retired and that he name Kara as the beneficiary under his

---

[8] Former spouses are "intimate partners" under 18 U.S.C. § 921(a)(32).

survivor benefit plan for his military retirement. Robert challenges these provisions in the trial court's property distribution order as well as the fairness of the property distribution.

We hold that the trial court abused its discretion when it imposed the lien in Kara's favor based in part on evidence of the projected lost profits from the parties' failed property transaction. We reverse and remand to the trial court to vacate this lien, and to recalculate the value of the lien against Robert's property without considering projected lost profits from the failed property transaction. We affirm on all other property distribution issues.

1.     Legal Principles

"In a marriage dissolution proceeding, the trial court must 'dispos[e] of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable after considering all relevant factors.' " *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005) (quoting RCW 26.09.080). Those factors include (1) the nature and extent of the community property, (2) the nature and extent of the separate property, (3) the duration of the marriage, and (4) the economic circumstances of each spouse at the time the property distribution is to become effective. RCW 26.09.080. These factors are not exclusive. *In re Marriage of Larson and Calhoun*, 178 Wn. App. 133, 138, 313 P.3d 1228 (2013). All property is before the court for distribution. *In re Marriage of Farmer*, 172 Wn.2d 616, 625, 259 P.3d 256 (2011).

> The court has "broad discretion" to determine what is just and equitable based on the circumstances of each case. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). A just and equitable division "does not require mathematical precision, but rather fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties." *In re Marriage of Crosetto*, 82 Wn. App. 545, 556, 918 P.2d 954 (1996). "Fairness is attained by considering all circumstances of the marriage and by exercising discretion, not by utilizing inflexible rules." *In re*

*Marriage of Tower*, 55 Wn. App. 697, 700, 780 P.2d 863 (1989). "Just and equitable distribution does not mean that the court must make an equal distribution." *In re Marriage of DewBerry*, 115 Wn. App. 351, 366, 62 P.3d 525 (2003). "Under appropriate circumstances . . . [the trial court] need not award separate property to its owner." *In re Marriage of White*, 105 Wn. App. 545, 549, 20 P.3d 481 (2001).

*Larson*, 178 Wn. App. at 138.

Because the trial court is in the best position to decide issues of fairness, we review a trial court's property division made during a dissolution of marriage for manifest abuse of discretion. *Muhammad*, 153 Wn.2d at 803; *Larson*, 178 Wn. App. at 138. " 'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.' " *Muhammad*, 153 Wn.2d at 803 (quoting *Littlefield*, 133 Wn.2d at 46–47). "Trial court decisions in dissolution proceedings will seldom be changed on appeal." *In re Marriage of Stenshoel*, 72 Wn. App. 800, 803, 866 P.2d 635 (1993).

2. Characterization of the Cheney and Montana Properties

In exercising its discretion to distribute property in a marriage dissolution, the trial court must characterize property as either separate or community. RCW 26.09.080; *In re Marriage of Brewer*, 137 Wn.2d 756, 766, 976 P.2d 102 (1999). The law favors characterization of property as community property "unless there is clearly no question of its separate character." *Brewer*, 137 Wn.2d at 766–67.

Property acquired during marriage is presumed to be community property. RCW 26.16.010-.030; *see In re Marriage of Short*, 125 Wn. 2d 865, 870, 890 P.2d 12 (1995). A party asserting that an asset acquired during marriage is separate property must overcome the community presumption by clear and convincing evidence. *In re Marriage of Marzetta*, 129

Wn. App. 607, 621, 120 P.3d 75 (2005), *overruled on other grounds by In re Marriage of McCausland*, 159 Wn.2d 607, 152 P.3d 1013 (2007).

Property acquired during marriage by inheritance is separate property and property acquired during marriage with traceable proceeds of separate property is separate property. *White*, 105 Wn. App. at 550. There is a presumption that any increase in value of separate property is also presumed to be separate property, but the presumption can be rebutted by evidence that the increase is attributable to community funds or labor. *In re Marriage of Elam*, 97 Wn.2d 811, 816, 650 P.2d 213 (1982). Property that is "purchased with both community funds and clearly traceable separate funds will be divided according to the contribution of each." *In re Marriage of Chumbley*, 150 Wn.2d 1, 8, 74 P.3d 129 (2003).

The trial court determined that Kara had a community interest in the Cheney and Montana properties because community resources had been used to purchase or improve them. The trial court stated that "[t]he community contributed funds, sweat equity and incurred liabilities for those properties." CP at 20. Robert argues that the two properties were his separate property because they were purchased using his separate property funds from the dissolution of his family trust and there was no evidence that community efforts increased the value of the properties. Robert's assertion that the properties were his separate property is without merit. There was evidence that the two Cheney properties were purchased with not only the funds from the trust dissolution but also the funds received from the sale of the Steilacoom property, a community property asset. Further, there was evidence that community funds were used to pay the mortgage on one of the properties and that community efforts and funds were used to improve both properties. Because community funds were used to purchase the properties

28

and because community efforts and funds were used to maintain the properties, we hold that Kara had a community interest in these properties.

Further, the proceeds from the Cheney property the parties sold were used to purchase the Montana property. Because Kara had a community interest in the Cheney property, she had a similar interest in the Montana property because it was purchased with proceeds from property in which she had a community interest. In addition, the parties paid the mortgage and made improvements to the Montana property with joint earnings. Accordingly, we hold that the trial court did not abuse its discretion when it decided that Kara was entitled to a lien in some amount on property awarded to Robert to account for her community interest in properties that were purchased, maintained, and financed in part with community funds.

3. Lien against Robert's Property

Robert argues that the trial court abused its discretion by imposing a $112,000 lien against property awarded to him in favor of Kara. He claims that in awarding Kara the lien, the trial court improperly relied on evidence that involved lost profits on a failed property transaction.[9] We agree.

In 1995, Kara and Robert agreed to purchase the Montana property from Robert's grandparents for $27,000. The parties agreed to pay Robert's grandparents $275 per month based on the cost of Robert's grandmother's medication. In 2005, after Robert's grandparents died, the parties realized that the property was part of a trust and they sued the trust to gain access to the property. The result was that the trust was dissolved; the trust property, including

---

[9] Robert argues that the failed transaction was the only identifiable basis for such a significant lien. But the trial court did not explicitly state that the $112,000 lien was based in part on the failed property transaction. Kara does not address this issue.

the property the parties had supposedly purchased, was sold; the parties were refunded the $14,350 they had paid for the property; and Robert received a payment for his portion of the trust. Kara testified that she objected to dissolving the trust and losing the property because a realtor in the area provided her with a list of similar properties that sold for between $85,000 and $130,000. The trial court may have considered evidence of the failed property transaction in determining the amount of the lien.

Whether the trial court properly could consider the lost profit on this Montana real estate transaction is controlled by *In re Marriage of Kaseburg*, 126 Wn. App. 546, 108 P.3d 1278 (2005). In *Kaseburg*, the parties in a dissolution action purchased a home and executed an $850,000 promissory note and deed of trust in favor of the husband's parents in recognition of loans they had given the parties in the past. 126 Wn. App. at 549. After the parties filed for dissolution but before trial, the husband's parents foreclosed on the property. *Kaseburg*, 126 Wn. App. at 550. At trial, the wife contested the value of the promissory note, stating that it was fraudulent and inflated, and requested a $500,000 judgment against the husband for concealing the value of the property. *Kaseburg*, 126 Wn. App. at 551-52. The trial court determined that the debt underlying the promissory note was actually $300,000, not $850,000, and determined that the wife had a $150,000 interest in the property. *Kaseburg*, 126 Wn. App. at 555. We reversed, holding that because the community's interest in the property was "legally extinguished in the foreclosure sale, the amount of the debt and the value of the real property were not before the trial court for valuation or distribution in the dissolution proceeding." *Kaseburg*, 126 Wn. App. at 559.

Applying *Kaseburg* here, it was improper for the trial court to award Kara a lien on Robert's property based on the projected value of the parties' failed real estate transaction. As in *Kaseburg*, we hold that Kara's opportunity to contest the resolution of her claim to the property was during the 2005 litigation and that she lost that opportunity when the litigation was resolved. *See White*, 105 Wn. App. at 549 ("If one or both parties disposed of an asset before trial, the court simply has no ability to distribute that asset at trial."). Accordingly, we hold that the trial court abused its discretion when it admitted and considered evidence of the lost value of the incomplete real estate transaction.

We vacate the $112,000 lien because it was based in part on the trial court's incorrect reliance on the failed Montana property deal. We also direct the trial court to remove this lien from the property records. Because it is unclear what portion (if any) of the lien related to the failed property transaction and because the trial court also based its decision to award the lien on the community nature of the properties and the community efforts used to finance and maintain the properties, we remand to the trial court to recalculate the amount of Kara's lien without consideration of the projected lost profits from the failed Montana property deal.

4. Life Insurance Policy and Survivor Benefit Plan

Robert argues that the trial court abused its discretion when it required him to maintain both a life insurance policy of $400,000 and to name Kara as a beneficiary under his survivor benefit plan for his military retirement. We disagree.

In *In re Marriage of Donovan*, 25 Wn. App. 691, 697-98, 612 P.2d 387 (1980), the trial court entered an award of child support secured by a lien on the husband's estate. The trial court also ordered the husband to maintain a life insurance policy naming his children as primary

beneficiaries. *Donovan*, 25 Wn. App. at 698. Division One of this court held that the award was inequitable because it provided his children with a double recovery of child support – from both the lien against the estate and the life insurance – should the father die before they reached the age of majority. *Donovan*, 25 Wn. App. at 698.

Here, if the life insurance policy was solely to secure Kara's interest in Robert's retirement benefits, then there might be an issue of double recovery because of the survivor benefit plan. *See Donovan*, 25 Wn. App. at 698. But the trial court also stated that the purpose of the life insurance policy was to pay Kara for any outstanding community obligations. These obligations could include child support and any other unpaid obligations from the decree owing to Kara in the event of Robert's untimely death, which are not secured by any other source. Accordingly, we hold that the trial court did not abuse its discretion when it ordered that Robert name Kara on his survivor benefit plan and required him to maintain life insurance.

5. Fairness of Property Distribution

Robert also argues that the trial court's overall property distribution was inequitable because it failed to consider the cost to him of selling his property to extinguish the lien and because the trial court required him to pay the balance of a credit card held in Kara's name with debt she incurred after the parties separated. We disagree.

First, Robert argues that because the only way for him to extinguish the $112,000 lien against him would be to sell his properties and because their sale will lead to "significant tax liability," the trial court should have considered the cost of their sale when distributing the parties' properties. Br. of Appellant at 40-41. In making this argument, Robert asks us first to presume that the only way for him to extinguish the lien would be to sell the properties when

there was no evidence that he would be otherwise unable to make payments from his income, and second to reconsider the evidence before the trial court. Because we do not re-weigh the evidence and because the trial court is in the best position to determine fairness in light of the evidence before it, we decline to address Robert's contention further. *Larson*, 178 Wn. App. at 138; *Meredith*, 148 Wn. App. at 891 n.1.

Second, Robert argues that the property distribution was unfair because the trial court ordered him to pay the balance of a credit card in Kara's name for debt she had incurred after the couple had separated. When the parties separated, they had an American Express card in Kara's name with a balance of $8,908.60. By the date of trial, the balance on the card was $22,465.00. Because liabilities incurred after separation are presumed to be the separate debt of the incurring spouse, Robert argues that the trial court abused its discretion when it ordered him to pay the entire balance of the credit card. *See Oil Heat Co. of Port Angeles, Inc. v. Sweeney*, 26 Wn. App. 351, 354, 613 P.2d 169 (1980).

But the court is not required to make an equal distribution of assets and liabilities and need not award separate debt to its owner. *DewBerry*, 115 Wn. App. at 366; *White*, 105 Wn. App. at 549. The fact that one of the debts assigned to Robert may have been Kara's separate debt did not require the trial court to specifically assign that particular debt to her, and Robert fails to show that it was not accounted for elsewhere in the property distribution. The trial court had all of the parties' assets and liabilities before it, and we hold that it made an equitable distribution of the property based on the facts of this case.

F.    MAINTENANCE

The trial court ordered that Robert pay spousal maintenance to Kara in the amount of $1,500 per month beginning on September 1, 2012, and $2,400 per month beginning on July 1, 2013. The trial court ruled that maintenance would continue until Robert retired and Kara began to receive her share of his retirement, and at that time maintenance would be reduced to $1.00 per month for life and would not terminate upon Kara's remarriage. Robert argues that the trial court abused its discretion in its order awarding maintenance to Kara. We hold that the evidence supported the maintenance award except for the award of $1.00 per month for Kara's life.

1.    Legal Principles

The trial court has statutory authority to order maintenance "in such amounts and for such periods of time as the court deems just, without regard to misconduct" after taking into consideration relevant factors. RCW 26.09.090(1); *In re Marriage of Drlik*, 121 Wn. App. 269, 276, 87 P.3d 1192 (2004). Maintenance is "a flexible tool to more nearly equalize the post-dissolution standard of living of the parties, where the marriage is long term and the superior earning capacity of one spouse is one of the few assets of the community." *In re Marriage of Sheffer*, 60 Wn. App. 51, 57, 802 P.2d 817 (1990). In awarding maintenance, the trial court's main concern must be the parties' economic situations after the dissolution. *In re Marriage of Williams*, 84 Wn. App. 263, 268, 927 P.2d 679 (1996).

An award of maintenance is within the broad discretion of the trial court. *In re Marriage of Bulicek*, 59 Wn. App. 630, 633, 800 P.2d 394 (1990). A trial court abuses its discretion when its decision is based on untenable grounds or reasons. *In re Marriage of Foley*, 84 Wn. App. 839, 845, 930 P.2d 929 (1997). "An award of maintenance that is not based upon a fair

consideration of the statutory factors constitutes an abuse of discretion." *Crosetto*, 82 Wn. App. at 558. However, the trial court is not required to make specific factual findings on all of the factors. *In re Marriage of Mansour*, 126 Wn. App. 1, 16, 106 P.3d 768 (2004). Rather, the statute merely requires the trial court to consider the listed factors. *Mansour*, 126 Wn. App. at 16. "[T]he only limitation placed upon the trial court's ability to award maintenance is that the amount and duration, considering all relevant factors, be just." *In re Marriage of Washburn*, 101 Wn.2d 168, 178, 677 P.2d 152 (1984).

2.    Future Earning Capacity

Robert argues that the trial court abused its discretion in setting the maintenance amount because there was no evidence at trial regarding the parties' future earning capacities and therefore the trial court's award was speculative and not supported by the evidence. We disagree.

In setting the maintenance award, the trial court reasoned that Robert "will be in a substantially better financial position than [Kara] after the dissolution." CP at 68. The trial court further reasoned that Robert had earned a masters degree during the marriage and would have good employment prospects after his military retirement. By contrast, the trial court found that Kara had "limited and interrupted work experience and is not likely to catch up to [Robert] in earning potential." CP at 69. The trial court further noted that she had to leave jobs and follow Robert during his military career.

These findings are supported by the evidence. The court heard testimony on Kara's work history from which it could reasonably determine her likely future earning capacity. Kara has a bachelor's degree in physical education and has taken courses for a master's degree in guidance

counseling. She testified that she wanted to finish her degree but that her primary goal was to obtain employment to support her children. She is not a certified teacher and is generally eligible to work as a teacher in local school districts only in an emergency situation. Kara worked as an X-ray technician when the parties were first married, earning $10 per hour. She also worked for an orthopedic surgeon in Gig Harbor, earning approximately $12 per hour. She worked at a winery in Spokane, earning $9.50 per hour. She worked as a substitute teacher in Italy, earning $95 per day. After the parties separated, Kara had a job at Fort Lewis as an education counselor, earning $20 per hour. The company for which she worked as a counselor lost its contract with Fort Lewis and Kara was laid off; but she was offered and accepted her former position with a new company for $12.75 per hour. In March 2012, Kara was laid off after her employer stated that it had received information that Kara's life and the lives of her children were in immediate danger. Kara then received unemployment at $406 per week and was receiving that amount at the time of trial, despite her efforts to find employment.

The trial court also heard testimony regarding the numerous positions Robert held while in the military and knew that his gross monthly income at the time of trial was $10,930.16. Robert had a bachelor's degree in business and had also obtained a masters degree in business administration during the marriage. We hold that Robert's challenge to the trial court's findings regarding the parties' future earning capacities fails because the trial court heard ample evidence about the parties' education, work experience, and income.

3.      Duration of Maintenance Award

Robert argues that the trial court abused its discretion when it awarded Kara spousal maintenance of $1.00 per month for life once Robert retired. The trial court stated that it was

36

making this award in order to preserve jurisdiction over the parties in the future. We hold that the trial court abused its discretion in making a placeholder award simply to extend jurisdiction over the parties.

Division One of this court recently addressed a similar issue in *In re Marriage of Valente*, __ Wn. App. __, 320 P.3d 115 (2014). In *Valente*, the wife in a dissolution action received a maintenance award to help with her future medical costs for multiple sclerosis and rheumatoid arthritis. 320 P.3d at 116-17. The trial court awarded her $10,000 per month for seven years, then $1,000 per month until she turned 72 years old, then $100 per month until either the husband's or wife's death or the wife's remarriage, whichever occurred first. *Valente*, 320 P.3d at 117. The husband challenged the $1,000 and $100 per month maintenance awards, claiming that they were merely a vehicle for the court to retain jurisdiction over the parties. *Valente*, 320 P.3d at 118. The trial court stated that the reason for the $100 lifetime maintenance award was to allow the court to revisit the award and would allow the wife to have an "ongoing maintenance adjustment." *Valente*, 320 P.3d at 118.

The court noted that permanent maintenance awards generally are disfavored but that a lifetime award may be proper " 'when it is clear the party seeking maintenance will not be able to contribute significantly to . . . her own livelihood.' " *Valente*, 320 P.3d at 117 (quoting *In re Marriage of Mathews*, 70 Wn. App. 116, 124, 853 P.2d 462 (1993)). The court then examined two Washington cases dealing with lifetime maintenance awards based on anticipation of future medical needs. *Valente*, 320 P.3d at 118-19. Those cases found the awards to be an abuse of discretion because they were conjectural and therefore lacked the finding of necessity required for maintenance awards. *Valente*, 320 P.3d at 118-19.

Although the trial court in *Valente* found that the wife may incur future medical expenses, it did not make any findings as to the likelihood or degree to which her condition might worsen. *Valente*, 320 P.3d at 119. The court held that the trial court's findings were insufficient to establish a foundation for retaining jurisdiction and therefore it abused its discretion in awarding the maintenance:

> A dissolution is supposed to finalize the parties' obligations to one another. By reserving jurisdiction to modify maintenance for the duration of [the wife]'s lifetime, or until her remarriage, [the husband]'s obligations under the decree remain unsettled. While maintenance is a flexible tool, there is no showing that the legislature intended to grant broad authority for open ended maintenance as urged by [the wife]. Maintenance cannot be used as an insurance policy against potential hardship in the absence of specific findings regarding the certainty that those hardships are likely to occur.

*Valente*, 320 P.3d at 119-20 (footnotes omitted).

Here, the trial court awarded lifetime maintenance that terminated only upon the parties' deaths. The trial court further stated that the award was non-modifiable unless Robert did "anything resulting in the loss of [Kara]'s retirement benefits outlined above at any time after maintenance is reduced to $1.00 per month." CP at 81. The court explicitly stated that "[t]he amount is intended to allow the court to reserve jurisdiction in the future." CP at 81. The award was based on speculation that Robert might do something in the future to prevent Kara from receiving his retirement benefits. This is the type of conjectural basis that *Valente* and the cases on which it relied were rejected. The trial court here did not enter any specific findings regarding Robert's likelihood of preventing Kara from receiving benefits in the future. Accordingly, we hold that it was an abuse of discretion to award lifetime spousal maintenance for the purpose of retaining jurisdiction alone, and we vacate that portion of the maintenance order. We remand for the trial court to consider the award of maintenance after Robert retires. If

38

the trial court on remand wishes to impose lifetime maintenance, it must enter specific findings supporting that decision.

G. ATTORNEY FEES

1. Fees at Trial

Robert argues that the trial court's decision to award Kara $30,000 in attorney fees was an abuse of discretion based on Robert's ability to pay and Kara's need. We disagree.

The trial court in a dissolution action may award reasonable attorney fees to one of the parties after considering the financial resources of both parties. RCW 26.09.140. In determining whether it should award fees, "the court considers the parties' relative need versus ability to pay." *In re Marriage of Spreen*, 107 Wn. App. 341, 351, 28 P.3d 769 (2001). We review an attorney fee award for abuse of discretion and will reverse if the decision is untenable or manifestly unreasonable. *Spreen*, 107 Wn. App. at 351. "In calculating a fee award a court should consider: (1) the factual and legal questions involved; (2) the time necessary for preparation and presentation of the case; and (3) the amount and character of the property involved." *In re Marriage of Knight*, 75 Wn. App. 721, 730, 880 P.2d 71 (1994). The trial court must indicate on the record the method it used to calculate the award. *Knight*, 75 Wn. App. at 729.

Here, the trial court found that Kara had the need for an award to cover her attorney fees and that Robert had the ability to pay, based on the same reasons supporting its maintenance award. It found that Robert would be in a better financial position than Kara after the dissolution because he had earned a master's degree during the marriage, was expecting a military retirement, and had good employment prospects thereafter. By contrast, the trial court found that

Kara had limited and interrupted work experience because she moved with Robert for his military career and that she was "not likely to catch up to him in earning potential." CP at 69. As discussed above, the trial court had ample evidence before it supporting these findings.

In his challenge to the fee award here, Robert argues that because Kara would be in a better position following the dissolution based on the trial court's property distribution, the trial court abused its discretion when it ordered him to pay an additional $30,000 for Kara's attorney fees. Because of this, Robert argues that the trial court "failed to determine the financial resources of each party when deciding to impose a substantial fee award against Robert." Br. of Appellant at 47. However, Robert fails to cite any authority requiring the trial court to specifically consider the property distribution in the dissolution action when determining financial need. Accordingly, we hold that the trial court did not abuse its discretion when it determined that Robert had the ability to pay attorney fees and that Kara had a financial need.

2.    Fees on Appeal

Kara requests her fees on appeal under RAP 18.1(a) and RCW 26.09.140. RCW 26.09.140 gives us discretion to "order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." "In exercising our discretion, we consider the issues' arguable merit on appeal and the parties' financial resources, balancing the financial need of the requesting party against the other party's ability to pay." *In re Marriage of Kim*, 317 P.3d 555, 567 (2014).

Kara filed a financial declaration stating that her net monthly income is $2,417.35 and her total monthly expenses are $7,019.41. Her financial declaration estimates Robert's net monthly income at $7,433.62.

No. 44068-7-II

Based on Kara's financial declaration, it appears that she has a financial need and that Robert has the ability to pay. Accordingly, we order Robert to pay Kara's attorney fees on appeal.

CONCLUSION

We remand to the trial court to consider whether the waiver of relocation notice requirements was proper under RCW 26.09.460(4) and to make the required findings, if appropriate. We also reverse the trial court's lien in Kara's favor on property awarded to Robert insofar as the lien amount relates to evidence of the failed 2005 Montana property deal, and we remand for recalculation of the lien, if any, without consideration of this evidence. Finally, we vacate the trial court's order of $1.00 per month in spousal maintenance and remand for consideration of spousal maintenance for the period after Robert retires. We affirm on all other issues.

MAXA, J.

We concur:

HUNT, P.J.

BJORGEN, J., A.C.J.